IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **HERACLIO DIAZ-SANCHEZ AKA MIGUEL RAFAL BARAJAS-MAGNA**, <br><br>        Defendant. | Case No. 3:23-cr-122-SI <br><br> **ORDER** |

**Michael H. Simon, District Judge.**

      Defendant Heraclio Diaz-Sanchez, also known as Miguel Rafal Barajas-Magna, moves to suppress evidence seized on December 19, 2022, when he was stopped by an Oregon State Trooper while Mr. Diaz-Sanchez was driving northbound on Interstate Highway 5 (I-5). Defendant argues that the warrantless seizure from the trunk of his car of 16.6 pounds of cocaine wrapped in six vacuum sealed packages taped closed with black carbon fiber tape, along with other items, including a drug ledger, was done in violation of his Fourth Amendment rights. The government offers the following arguments in support of the search and seizure: (1) the traffic stop was lawful and not unlawfully extended; (2) the Defendant validly consented to the search of the vehicle that he was driving; (3) the cocaine that was seized would have been inevitably

PAGE 1 – ORDER

discovered; and (4) the search was valid under the automobile exception to the warrant requirement.

The Court held an evidentiary hearing on August 22, 2023, and heard testimony from Trooper Adam Miller of the Oregon State Police. The Court received in evidence the exhibits submitted by the parties, including the Trooper's body-worn camera video. The Court also received post-hearing briefs from the parties. For the reasons explained below, the Court DENIES Defendant's motion to suppress and makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

On December 19, 2022, Defendant, Heraclio Diaz-Sanchez, was driving northbound on I-5 from California. Near Salem, Oregon, Trooper Miller of the Oregon State Police noticed Mr. Diaz-Sanchez's car, a nondescript silver Honda Accord, with a California license plate. Trooper Miller observed the Honda following slightly too close to a truck, and the Trooper ran a check on the license plate. The Honda was registered to Luis Gerardo Diaz from Gerber, California, but the vehicle's registration had been suspended as of that day. Based on his experience, Trooper Miller believed that meant that the Honda did not have proof of automobile insurance on file with the State of California.

Trooper Miller turned on his lights and initiated a traffic stop. Mr. Diaz-Sanchez complied immediately by pulling over to the right shoulder of the road. When Trooper Miller approached the car, he saw that the back window was heavily tinted. Trooper Miller could not see inside the car. He tapped on the glass and asked the driver to roll down the back passenger window. The driver complied. Trooper Miller saw no one else in the car and approached the front passenger side. Trooper Miller is equipped with a body camera, and the entire contact was captured on video.

PAGE 2 – ORDER

Trooper Miller asked Mr. Diaz-Sanchez questions related to the traffic stop, including inquiring about who owned the car. Mr. Diaz-Sanchez politely replied that this was his brother's car. As Trooper Miller explained the reason for the stop, he noticed four or five air fresheners hanging on the rearview mirror and the "moderate" odor of raw marijuana coming from the vehicle. ECF 34, at 13:16-14:8. Mr. Diaz-Sanchez provided Trooper Miller with a valid driver's license, vehicle registration, and what appeared to be proof of insurance. Trooper Miller, however, noticed that the insurance had expired in September 2022 and informed Mr. Diaz-Sanchez of that fact. The registration matched the name of Mr. Diaz-Sanchez's brother, Luis Gerardo Diaz, whose address was in Gerber, California, near Sacramento.

Trooper Miller returned to the Honda and asked Mr. Diaz-Sanchez if he could call his brother to get insurance on the car so Mr. Diaz-Sanchez could continue to drive it. Defendant responded that neither he nor his brother had a credit card to get insurance over the telephone. Defendant requested to drive to the next town, but Trooper Miller said that he would not let Mr. Diaz-Sanchez drive away without valid automobile insurance. While Trooper Miller was waiting for Mr. Diaz-Sanchez to see if he could obtain automobile insurance, the trooper asked a few additional questions. Trooper Miller asked about Mr. Diaz-Sanchez's destination and the purpose of his visit. Mr. Diaz-Sanchez responded that he was going to his niece's sweet-16 birthday party in Portland. Trooper Miller went back to his patrol car to check for warrants and driving status.

Approximately nine minutes later, Trooper Miller returned to Mr. Diaz-Sanchez's car. Trooper Miller asked Mr. Diaz-Sanchez whether he was having any luck with getting automobile insurance. Mr. Diaz-Sanchez said he could not reach his brother, so he called a friend in Texas

for help in obtaining insurance. That aroused Trooper Miller's suspicion. As Trooper Miller explained:

> Because I thought if he was traveling to Portland like he told me he was for a family birthday party, that he would call a family member from Portland, since he's pretty close to Portland to help him get the insurance, but instead he called a friend in Texas.

ECF 34, at 16:20-24. In addition, the Trooper asked Mr. Diaz-Sanchez where he was staying in Portland, and Mr. Diaz-Sanchez replied, "a hotel." *Id*. at 27:17-18. Although the Trooper did not ask which hotel, *id*. at 28:6-8, the fact that Mr. Diaz-Sanchez did not respond with a specific hotel also arose suspicion. *Id*. at 16:25-17:3.

Trooper Miller asked Mr. Diaz-Sanchez if there were any drugs in the car, and Mr. Diaz-Sanchez showed the Trooper approximately one ounce of marijuana in a bag on the front seat. *Id*. at 17:23-18:2. Although marijuana possession is legal under state law in both Oregon and California, Trooper Miller informed Mr. Diaz-Sanchez that bringing marijuana into Oregon from California is against the law. *Id*. at 39:8-15.

Trooper Miller also was aware of the practice of drug traffickers using a "throw-down bag" of marijuana. As Trooper Miller explained:

> Q. So when you searched the car, did you think you had probable cause?
>
> A. Yes.
>
> Q. What do you think you had probable cause for?
>
> A. I believed he was trafficking marijuana into Oregon or possessing marijuana illegally.
>
> Q. Okay. And what did you base that on?
>
> A. The odor that I smelled and then him showing me the bag of marijuana.
>
> Q. Okay. Are you aware of the term of a "throw-down bag"?

PAGE 4 – ORDER

>   A.   Yes.
>
>   Q.   Explain to us what that is.
>
>   A.   A throw-down bag is, especially in Oregon, because marijuana -- the ORS for marijuana allows a person to possess a decent amount of marijuana in the car, they will keep that in the car if they're trafficking large quantities of drugs that could actually get them in trouble, hard drugs like methamphetamine, cocaine, that kind of thing, Fentanyl. And their hope is that if we see the marijuana, smell the marijuana, and they show us the marijuana and it's a smaller amount, that law enforcement is going to dismiss that and tell them, "Not worried about that. You can be on your way."
>
>   Q.   Okay. Is that something you see regularly in your job?
>
>   A.   Fairly frequently, yes.
>
>   Q.   Was your probable cause just based on state law or was it also based on federal law?
>
>   A.   Federal law.
>
>   Q.   As well?
>
>   A.   As well, yes.
>
>   Q.   Okay. And specifically what for [*sic*] federal law?
>
>   A.   Possessing the marijuana.

*Id*. at 19:6-20:11.

The Trooper asked if there was any other marijuana or hard drugs in the car. Mr. Diaz-Sanchez responded, "No." The Trooper then asked if there was any cocaine in the car, and Mr. Diaz-Sanchez replied, "Hell, no." *Id.* at 18:3-12. Trooper Miller also asked if he could search the car to make sure there were no other drugs. Defendant stopped smiling and replied by asking, "Why do you want to search the car?" *Id*. at 34:11-18; *see also id*. at 18:16-18. Trooper Miller explained that he wanted to make sure there were no other drugs. The Trooper noticed Defendant's demeanor change from smiling and relaxed to tense, rigid, and defensive. Trooper

PAGE 5 – ORDER

Miller asked again for permission to look inside the car. This time Mr. Diaz-Sanchez responded, "I don't have anything." *Id*. at 34:19-22. Trooper Miller asked for a third time for permission to search the car. Mr. Diaz-Sanchez answered, "What would be the point? I don't have anything." *Id*. at 34:25-35:3. The fact that Mr. Diaz-Sanchez gave *non-responsive* answers to Trooper Miller also aroused Trooper Miller's suspicions. *Id*. at 18:19-23.

Trooper Miller, who had a drug-sniffing trained dog with him, next asked for permission to "run my dog around the car." After a brief discussion about whether the smell of marijuana would cause the drug to alert (Trooper Miller explained that the dog would not bark just over the smell of marijuana.), Mr. Diaz-Sanchez replied, "Okay, do want you want to do." *Id*. at 36:13-37:6. Trooper Miller then asked Defendant to step out of the car. Mr. Diaz-Sanchez asked if he should turn off the engine, and Trooper Miller said he should. Defendant got out of the car, holding his phone, which appeared to be in use.

Trooper Miller patted down the Defendant, looking for weapons, and felt a large wad of currency and a second cell phone. During this process, one of Defendant's cell phones rang, and Trooper Miller allowed Mr. Diaz-Sanchez to answer it. Defendant stood in front of the patrol car with Trooper Smith, while the Trooper explained that he would be searching the car. Defendant asked if he was going to run the dog, and Trooper Miller said that his search was based on the marijuana that Defendant brought across state lines.

Defendant still had the keys to the Honda. He was updating someone on the cell phone, in real time, about the traffic stop. Trooper Miller asked Defendant if he could have the key fob to unlock the trunk. Defendant hung up the phone call and gave Trooper Miller the key fob. The trooper opened the trunk and immediately noticed a strong smell of Armor All. Trooper Miller

saw a blue duffle bag, a sealed cardboard box, and a black backpack. The Trooper opened the cardboard box and saw what appeared to be vacuum sealed packages of cocaine.

Trooper Miller then returned to Mr. Sanchez and placed him under arrest. During the search incident to arrest, Trooper Miller located an unfolded dollar bill with cocaine in it. The Trooper continued to search the vehicle and found a drug ledger in the driver's side door pocket. He emptied the cardboard box, which contained six vacuum sealed packages taped in black carbon fiber tape. Later testing confirmed that the packages contained cocaine and weighed 16.6 pounds.

Trooper Miller is a narcotics detective and canine handler for the Oregon State Police. He also servs as a Task Force Trooper with the Salem DEA. He has been a Trooper for more than 24 years, with 20 years assigned to narcotics investigations. In December 2022, Trooper Miller was assigned to handle criminal interdictions on state highways throughout Oregon. By then, he had attended hundreds of hours of criminal interdiction training focused on narcotics and human trafficking trends in the United States.

## CONCLUSIONS OF LAW

**A. General Standards**

The Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures by the government. U.S. Const., amend. IV. Searches conducted without prior approval by a judge or magistrate are deemed unreasonable per se, "subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009); *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). The government bears the burden of proving that a warrantless search or seizure falls within one of these exceptions. *United States v. Scott*, 705 F.3d 410, 416-17 (9th Cir. 2012). One exception to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *See*

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Also, "Troopers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *California v. Carney*, 471 U.S., at 392-393 (1985). This is referred to as the "automobile exception."

When evidence is gathered in a search and seizure that violates the Fourth Amendment, the exclusionary rule generally prevents its use in a criminal trial brought against the victim of the unlawful search. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987). In *Nix v. Williams*, 467 U.S. 431, 104 (1984), however, the Court held that evidence obtained in violation of the Constitution could still be admitted at trial if the government could prove "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444.

A traffic stop may be considered a seizure under the Fourth Amendment. For a traffic stop to be reasonable, the law enforcement officer conducting or authorizing the seizure must show that there was reasonable suspicion to pull over the vehicle. *See Heien v. North Carolina*, 574 U.S. 54 (2014). Further, an officer may not prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 350, 355 (2015).

**B. Whether the Traffic Stop Was Unreasonably Prolonged**

In a traffic stop scenario, any seizure "exceeding the time needed to handle the matter for which the stop was made" is considered a violation of the Constitution's protection against unreasonable seizures. *Rodriguez*, 575 US at 350 (citation omitted). A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 350-51. The tolerable duration of a traffic stop is determined by its mission, which is "to address the traffic violation that warranted the stop, *and*

PAGE 8 – ORDER

*to attend to related safety concerns*." *Id.* at 354 (emphasis added). The "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. Any tasks unrelated to the traffic mission that add time to the stop are unlawful, unless supported by independent reasonable suspicion of wrongdoing. *Id.* at 357.

Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc). In other words, reasonable suspicion must be "more than the mere subjective impressions of a particular officer." *United States v. Thomas*, 211 F.3d 1186, 1191 (9th Cir. 2000) (citation omitted); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). If the extension of the stop and the subsequent search were not justified, any evidence obtained as a result is subject to suppression.

Here, the traffic stop was not unreasonably prolonged. As Trooper Miller explained, because Mr. Diaz-Sanchez did not have valid automobile insurance, the Trooper was not going to allow Mr. Diaz-Sanchez to drive away. The Trooper gave Defendant an opportunity to obtain, either himself or through another person, valid insurance. But until insurance was obtained, the Trooper reasonably declined to allowed Mr. Diaz-Sanchez simply to drive away uninsured. Valid insurance never arrived.

**C. Whether the Defendant Consented to the Search**

"The Fourth Amendment gives citizens the right to refuse to consent to warrantless searches and seizures." *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994). A law enforcement officer, however, is justified in executing a search of a vehicle upon receipt of "voluntary, *unequivocal, and specific* consent." *United States v. Taylor*, 60 F.4th 1243 (9th Cir. 2023) (emphasis added). Unequivocal and specific consent may be given expressly or

PAGE 9 – ORDER

inferred from gestures, such as a nod of the head. *Id.* Express consent can encompass shorthand statements that, in context, signal a defendant's agreement to the search. *See id.* (noting that the statement "it don't matter to me" in response to request to search is an unambiguous express consent).

Even unequivocal and specific consent, however, must be voluntary. Courts determine the voluntariness of consent based on the totality of the circumstances, focusing on the following five key, but not exclusive, factors: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Id.* The measure of these factors is guided by an objective standard of reasonableness, or "what would the typical reasonable person have understood by the exchange between the trooper and the suspect?" *Id.*

"No one factor is determinative in the equation," nor is it "necessary to check off all five factors" to establish the voluntariness of consent. *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). These "factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Id.* Further, a defendant's knowledge of the "right to refuse consent" is not a prerequisite for establishing voluntariness, and a calm and friendly interaction between the trooper and defendant can point to voluntariness. *Taylor*, 60 F.4th at 1243.

Mr. Diaz-Sanchez never gave "unequivocal and specific consent" to Trooper Miller to search the car. Three times Trooper Miller asked for consent, and each time Mr. Diaz-Sanchez avoided giving a direct answer. Thus, there was no expression of unequivocal and specific consent to search. When Trooper Miller then asked for consent to run his drug detection dog around the car, Mr. Diaz-Sanchez replied, "Okay, do want you want to do." That might (and

probably is) unequivocal and specific consent for Trooper Miller to run his drug detection dog around the exterior of the car, which never happened, but it is not unequivocal and specific consent for Trooper Miller to search the interior of the car, including opening the trunk.

**D. Whether the Cocaine Would Have Been Inevitably Discovered**

The inevitable discovery doctrine permits the admission of otherwise excludable evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." *Nix v. Williams*, 467 U.S. 471, 447 (1984); *see also United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) (noting that this doctrine is applicable when it is apparent that, through the execution of routine procedures, the evidence in question would have been unveiled). The government need make this showing only by a preponderance of the evidence. *See id.* at 444.

The discovery of contraband such as drugs through a foreseeable canine sniff can qualify as inevitable discovery. *See e.g., United States v. Alden*, 50 F. App'x 869, 870 (9th Cir. 2002) (noting that officers would have found drugs from canine sniff around car); *United States v. Seward*, 68 F.3d 482 (9th Cir. 1995) (unpublished) (stating that a bag containing drugs would have nevertheless been subjected to canine sniff).

During the evidentiary hearing, the government asked whether, based his experience with this drug detection dog and the training received by the dog, Trooper Miller believed it was more likely than not that the dog would have alerted to the wrapped and sealed cocaine contained in the cardboard box located in the trunk of the car. Trooper Miller answered in the affirmative. But he also explained that the dog most likely would have been alerting to the smell of cocaine somewhere on the car's frame or handles *if* the person who placed the wrapped cocaine in the trunk would have had some drug residue on his hand and *if* that person would have touched some portion of the car's exterior, including its handles. This testimony is too speculative to support a

PAGE 11 – ORDER

conclusion of inevitable disclosure. There also was no explanation for why Trooper Miller did not run his dog around the car after receiving Defendant's consent to do that. The explanation cannot be that Trooper Miller already believed that he had received Defendant's unequivocal and specific consent to search the interior of the car because not such consent was received. Also, Trooper Miller did not indicate in his report that he received consent.

### E.  Whether the Search Falls within the Automobile Exception

"Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012). The justification for the automobile exception arises from the "exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles." *Id.*; *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Thus, if the vehicle is "readily mobile by the turn of an ignition key, [even if it is] not actually moving" and is being "use[d] as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling," then "the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable," so long as there is probable cause. *California v. Carney*, 471 U.S. 386, 393 (1985).

Probable cause is "a belief, reasonably arising out of circumstances known to the seizing Trooper, that an automobile or other vehicle contains that which by law is subject to seizure and destruction[.]" *Carroll v. United States*, 267 U.S. 132, 149 (1925). An officer has probable cause to search an automobile when the totality of the circumstances indicate a reasonable probability that "contraband or evidence of a crime will be found in a particular place." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). Further, probable cause can be based in part on reasonable inferences. *Id.*

Also, probable cause does not represent a high threshold; it requires only the "kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 1050, 1055 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983)); *see Gerstein v. Pugh*, 420 U.S., 103, 121 (1975) (contrasting probable cause for reasonable-doubt and preponderance standards). *Kaley v. United States*, 571 U.S. 320, 338 (2014). In addition, probable cause requires only a probability or substantial chance of criminal activity, not an actual demonstration of such activity. *United States v. Guerrero*, 47 F.4th 984, 986 (9th Cir. 2022); *amended on denial of reh'g*, 50 F.4th 1291 (9th Cir. 2022).

Trooper Miller had probable cause to believe that Defendant's car contained contraband and evidence related to the unlawful importation of marijuana. Thus, the trooper's search of Defendant's car, including the trunk and its containers, was lawful. *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). It is well settled that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Hart v. Parks*, 450 F.3d 1059, 1067 (9th Cir. 2006); *see also United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) ("[e]xperience and expertise may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer").

Trooper Miller saw what he described as a "throw-down bag" of marijuana, which Defendant readily showed to the trooper. Trooper Miller then informed the Defendant that the Trooper wanted to search the car to make sure he did not have anything else in the car other than the small amount of marijuana that the Defendant showed him. The Trooper described the

Defendant's change of demeanor during this exchange, and noted, in the context of this discussion, the Trooper's knowledge of tactics used by drug smugglers to try to discourage law enforcement from doing a thorough investigation. This included the use of a "throw-down bag" containing a small amount of marijuana.

Defendant possessed marijuana and admitted to transporting it from California into Oregon. This admission along with the other facts considered in the context of Trooper Miller's extensive training and experience, including Defendant's use of a throw-down bag and failure to give direct responses, either way, to the Trooper's repeated requests for consent, support a "fair probability" that evidence or contraband will be found in a particular place—here, the car that Defendant was driving. These facts include Trooper Miller's awareness that the Defendant was driving from California, knowledge of the "throw-down bag" tactic, experience with a "moderate odor" of marijuana yielding pounds of marijuana, observation of the Defendant's change of demeanor when he asked about searching the car, and his objectively reasonable interpretation of the Defendant's non-responsive answers to the Trooper repeatedly asking for consent to search the car.

Under Oregon law, importation of marijuana is either a Class B violation, Class A misdemeanor, or Class C felony, depending on the circumstances. Or. Rev. Stat. § 475C.229. Defendant had already admitted to at least a Class B violation, and Trooper Miller had probable cause to investigate further to determine the full scope of the offense based on the totality of the circumstances. This is true even under Oregon state law. *See State v. Tallman*, 76 Or. App. 715, 721 (1985) ("Although possession of less than one ounce of marijuana does not itself create probable cause to search for more, it is still relevant in determining whether probable cause

PAGE 14 – ORDER

exists. Other facts, including suspicious actions and inculpatory statements, may unite with the possession to produce the necessary level of probability.").

As noted, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825. The Supreme Court has repeatedly upheld this premise. *See Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("When there is probable cause to search for contraband in a car, it is reasonable for police officers to examine packages and containers without a showing of individualized probable cause for each one"); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam ) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more"); *California v. Acevedo*, 500 U.S. 565, 572 (1991) ("*Ross* held that closed containers encountered by the police during a warrantless search of a car pursuant to the automobile exception could also be searched"); *United States v. Johns*, 469 U.S. 478, 479-480 (1985) (stating that *Ross* "held that if police officers have probable cause to search a lawfully stopped vehicle, they may conduct a warrantless search of any containers found inside that may conceal the object of the search").

The law is similar in the Ninth Circuit. *See United States v. Ewing*, 638 F.3d 1226, 1233 (9th Cir. 2011) ("Because [the officer] had probable cause to search the car, he was permitted to seize and examine suspected contraband found within it."); *United States v. Pinela-Hernandez*, 262 F.3d 974, 979 (9th Cir. 2001) ("Because there was probable cause to search the car, there was probable cause to open the trunk and to search the packages that turned out to contain marijuana"); *United States v. Arias*, 923 F.2d 1387, 1390 (9th Cir. 1991) (concluding that a search of boxes in trunk is permissible when a search was based on probable cause of "a

generalized belief that the car contained contraband somewhere inside"); *United States v. Vasquez,* 858 F.2d 1387, 1391 (9th Cir. 1988) ("[I]f the police have probable cause to search a lawfully stopped vehicle, then the police may search every part of the vehicle and its contents that may conceal the object of the search.") (cleaned up).

In conclusion, Trooper Miller's probable cause belief, based on the totality of the circumstances, was that the car contained additional contraband and evidence of more unlawfully imported marijuana. That allowed him to search the entire car and its contents. His search of the trunk and the box and bags found in the trunk, therefore, was lawful.

## CONCLUSION

The Court DENIES Defendant's Motion to Suppress (ECF 21) based on the automobile exception to the Fourth Amendment's warrant requirement.

**IT IS SO ORDERED.**

DATED this 19th day of September, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 16 – ORDER